# COURT OF APPEALS
# DECISION
# DATED AND FILED

## July 8, 2026

**Samuel A. Christensen**
**Clerk of Court of Appeals**

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. §808.10 and RULE 809.62.

**Appeal No. 2026AP132**

**STATE OF WISCONSIN**

Cir. Ct. No. 2023ME183

**IN COURT OF APPEALS**
**DISTRICT II**

IN THE MATTER OF THE MENTAL COMMITMENT OF P.L.:

RACINE COUNTY,

    PETITIONER-RESPONDENT,

V.

P.L.,

    RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Racine County: JESSICA E.H. LYNOTT, Judge. *Affirmed.*

¶1 GROGAN, J.[1] P.L.[2] appeals from a WIS. STAT. ch. 51 ("ch. 51") order extending his commitment and an involuntary medication order entered after

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2) (2023-24). All references to the Wisconsin Statutes are to the 2023-24 version.

the December 2024 extension hearing.[3] P.L. contends that Racine County failed to introduce clear and convincing evidence to support the conclusion that he is dangerous pursuant to either WIS. STAT. § 51.20(1)(a)2.b or 51.20(1)(am), and that the circuit court failed to make specific factual findings related to the dangerous standards. He contends that these errors require reversal of the orders. This court affirms.

## I. BACKGROUND

¶2 P.L. has been diagnosed with schizoaffective disorder, bipolar type, has a history of alcohol and drug use disorder, and has been continuously subject to a ch. 51 commitment order since January 2024. In November 2024, the County filed a Petition to extend P.L.'s involuntary commitment pursuant to WIS. STAT. § 51.20. In conjunction with that Petition, the County also filed a memorandum in support of the Petition. Dr. Leslie Taylor, a licensed psychiatrist, conducted an examination of P.L. and filed a report with the circuit court indicating that P.L. is mentally ill, dangerous, and a proper subject for commitment. The court held a hearing on the Petition in December 2024.

¶3 The County called two witnesses: (1) Dr. Taylor and (2) Fame Stolberg. P.L. also testified. Dr. Taylor testified that she is a licensed psychiatrist in the State of Wisconsin and met with P.L. to perform an evaluation to determine whether recommitment was necessary. When asked about the psychotropic

---

[2] This court uses initials for confidentiality. *See* WIS. STAT. RULE 809.81(8).

[3] With respect to the involuntary medication order, P.L.'s argument is limited. He does not make a specific argument challenging it. He argues only that if this court vacates the recommitment order, the medication order must be vacated as well.

medications being administered to P.L., Dr. Taylor testified that the medications would be helpful to him, helping him "better understand the instructions of the examination," and improve his mental health. P.L. had been given a settlement agreement regarding his mental health, and Dr. Taylor noted that he was not compliant with his settlement agreement—"[h]e didn't take [his] medications, and he was using substances … [h]e said he was doing drugs on the streets and breaking the law."

¶4 Asked about P.L.'s current mental state, Dr. Taylor confirmed that P.L. is diagnosed with schizoaffective disorder, in which he showed "some delusional thinking where he told me that he can control the thoughts of his family members." Going further, Dr. Taylor agreed that there is a substantial likelihood that P.L. would be a proper subject for commitment if his treatment were withdrawn and that his dangerousness presents a substantial probability of physical harm to others. When asked why she believes that, Dr. Taylor noted that P.L. "[had] been aggressive over the last year[,]" was aggressive towards his mother and younger sibling in the past, and had been arrested for getting into a bar fight. On cross-examination, Dr. Taylor stated that P.L. is "clearly psychotic. He hears voices[,]" and "he hears people telling him to rape and … kill children." Finally, Dr. Taylor recommended that P.L. should "continue to get treatment at the outpatient level of care for about 12 months." At the conclusion of Dr. Taylor's testimony, the County moved to enter her report into evidence. P.L. objected, but the circuit court admitted the report.

¶5 Stolberg testified she has been employed for behavior health services for Racine County for approximately two years and worked as P.L.'s case manager for about a year. When asked what led to the current period of commitment for P.L., Stolberg said P.L. was "having visual and auditory

3

hallucinations," was delusional, and was not "oriented to a person, place, time." Stolberg also confirmed that P.L. was often noncompliant with his treatment conditions, refusing to take his medications or go to doctor's appointments. When asked how P.L. coped with his thoughts and voices he was experiencing, Stolberg said P.L. used "illegal controlled substances … meth and crack cocaine." Asked about specific conversations with P.L., Stolberg testified that P.L. told her "that he would have thoughts like pedophiles have for children," and "he uses the drugs to mask his mental health symptoms[.]" Finally, Stolberg testified that she did not believe P.L. would be willing to remain free of illegal controlled substances on his own, as he still has his mental health symptoms.

¶6 P.L. testified that he prefers oral medication to injection as the injection causes soreness and is "painful and obnoxious." When asked about his illegal substance use, P.L said, "I have no desire to take them. The cost of like a 30-second high, just fucking think crazy evil shit for like months[,]" and "I can't see myself doing it again. [I]f I do -- I've had dreams where … I have my family and friends and my loved ones, or it's drugs." On cross-examination, P.L. recalled being violent towards his brother in the past: "I went to go fight him, and I jumped on the table requesting money." P.L also noted a fight with his mom's boyfriend, but testified, "it wasn't me actually getting violent. He actually approached me and grabbed me."

¶7 In response to multiple questions, P.L. confirmed that he had many bail-jumping charges due to taking illegal controlled substances, was found with drug paraphernalia on several occasions, and in the past had stated that he would stop using illegal substances. He confirmed that not taking illegal controlled substances was "not only a condition of [his] bond, but a condition of [his] commitment treatment conditions[.]" When asked about how his prescription

medication impacts him, P.L. testified, "it doesn't make much difference to me. I still think psychotic thoughts[,]" and "I don't think of the words 'rape' and 'kill' very often anymore. Now I'm stuck thinking other stupid shit." Finally, P.L. said in reference to the prescription drugs, "I'll still take it. I don't care. … [T]hey don't work."

¶8 After hearing closing arguments, the circuit court found that the County proved that P.L. was mentally ill, dangerous, and a proper subject for treatment. The court stated that the testimony given by Dr. Taylor and Ms. Stolberg was "shocking and disturbing to the Court[,]" and it's "shocking and disturbing how [P.L.] denies his issues and denies his medication" and "engages in illegal drugs to self-medicate[.]" Further, the court said P.L. is "clearly psychotic" and was shocked that "he hears voices telling him to rape and kill[.]". The court noted it's concerned that P.L. has consistently missed compliance with his prescription medications and did not believe that P.L. would take his medication voluntarily. Referring to the testimony of Ms. Stolberg, the court said her "testimony is shocking and [it is] clear and obvious that this recommitment is absolutely founded." Further, the court stated that P.L.'s "bond conditions, treatment conditions, all have been violated by his own actions. He has continued to land himself in legal peril by his own actions." It entered a commitment order recommitting P.L. for twelve months and entered an order allowing for involuntary medication for the same time period. P.L. now appeals.

## II. STANDARD OF REVIEW

¶9 In a ch. 51 recommitment hearing, the County has the burden to establish, by clear and convincing evidence, the necessary elements required for commitment, i.e., that the individual is mentally ill, a proper subject for treatment,

and dangerous. *See Langlade County v. D.J.W.*, 2020 WI 41, ¶29, 391 Wis. 2d 231, 942 N.W.2d 277; WIS. STAT. § 51.20(1)(a)1-2, (13)(e), 13(g)3. If the circuit court determines that the County carried its burden, the court must "make specific factual findings with reference to the subdivision paragraph of … § 51.20(1)(a)2. on which the recommitment is based." *See D.J.W.*, 391 Wis. 2d 231, ¶3.

¶10 This court's review of a recommitment order "presents a mixed question of law and fact." *Waukesha County v. J.W.J.*, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783. Appellate courts will "uphold a circuit court's findings of fact unless they are clearly erroneous[,]" *id.*, and will "accept reasonable inferences from the facts[,]" *Winnebago County v. Christopher S.*, 2016 WI 1, ¶50, 366 Wis. 2d 1, 878 N.W.2d 109 (citation omitted). Whether facts satisfy the statutory standards, however, is a question of law this court reviews de novo. *Marathon County v. D.K.*, 2020 WI 8, ¶18, 390 Wis. 2d 50, 937 N.W.2d 901.

### III. DISCUSSION

¶11 The issue presented on appeal is whether clear and convincing evidence in the Record supports the circuit court's factual findings upon which it concluded P.L. is dangerous and made sufficient specific factual findings to support its determination on dangerousness.[4] P.L. makes two arguments. First, he contends the County failed to establish he is currently dangerous because Dr. Taylor's report contained inadmissible hearsay. Second, he contends that the court failed to make the specific factual findings required by *D.J.W.* Based on this

---

[4] P.L. does not contest that he is mentally ill or a proper subject for treatment. Therefore, this court need not address these elements.

court's review of the briefs and the Record, this court rejects both of P.L.'s arguments.

## A. Evidence of Current Dangerousness

¶12    P.L.'s first argument is that the County failed to prove he was dangerous, that the Record does not contain sufficient evidence that he was dangerous, and that the circuit court's basis for concluding he was dangerous is based on hearsay.  P.L. believes Dr. Taylor's and Ms. Stolberg's testimony was too general, based on speculation rather than actual acts, and on hearsay.  This court rejects P.L.'s argument.

¶13    This court has reviewed the testimony.  It is sufficient to uphold the dangerousness determination.  P.L.'s aggressions, as evidenced by the bar fight, his habitual law-breaking causing him to be in and out of jail, and his own admission that he thinks about killing and raping children, are specific enough to support the commitment.  And, although thoughts alone without acting upon them may be insufficient, P.L.'s actions, combined with the thoughts, are more than sufficient.  He has shown during the time he was on the prior commitment that he will not abide by the law, he is aggressive with others, and he repeatedly uses illegal drugs.  These are the undisputed facts.  To suggest that P.L. is not dangerous to others under the totality of the circumstances would be to put blinders on.

¶14    The County's witnesses provided sufficient testimony to support the circuit court's dangerousness determination.  P.L.'s attempts to soften and explain away his conduct do not change the facts.  And, as the County points out, because this is a recommitment based on WIS. STAT. § 51.20(1)(am), the law does not hold Dr. Taylor to an "exacting, fortune-telling standard on a finding of

dangerousness[.]" *See **D.J.W.***, 391 Wis. 2d 231, ¶40. This court agrees with the County: "Witnesses and circuit courts are not required to recite 'magic words' in Chapter 51 cases. [***Marathon County v. D.K.***, 390 Wis. 2d 50, ¶66]. It is only necessary that a medical expert's testimony and conclusions should be 'linked back to the standards in the statute.' [***Id.***] at ¶85."

¶15    As to his contention that the circuit court's dangerousness determination was based on inadmissible hearsay contained in Dr. Taylor's report, this court rejects his argument. First, the only objection P.L. made during Dr. Taylor's testimony as to hearsay was after her testimony had concluded, and the County sought to introduce her report into evidence. P.L. failed to object *during* Dr. Taylor's live testimony about why she believed him to be dangerous. P.L.'s failure to make hearsay objections to Dr. Taylor's live testimony is fatal to his argument on appeal. *See **State v. Agnello***, 226 Wis. 2d 164, 173, 593 N.W.2d 427 (1999) (objections must be stated with specificity "so that both parties and courts have notice of the disputed issues as well as a fair opportunity to prepare and address them").

¶16    If P.L. saw Dr. Taylor's live testimony as an introduction of hearsay, he needed to object at the time of that testimony to preserve any hearsay challenge. *See* WIS. STAT. § 901.03; ***Bennett v. State***, 54 Wis. 2d 727, 735, 196 N.W.2d 704 (1972) ("An objection must be made to the introduction of evidence as soon as the adversary party is aware of the objectionable nature of the

testimony. Failure to object results in a [forfeiture[5]] of any contest to that evidence."); ***Rosche v. Wayne Feed Div., Cont'l Grain Co.***, 152 Wis. 2d 78, 81, 447 N.W.2d 94 (Ct. App. 1989) ("[A] party must object to the admission of evidence or be deemed to have [forfeited] objection to its admission."); ***Wingad v. John Deer & Co.***, 187 Wis. 2d 441, 458, 523 N.W.2d 274 (Ct. App. 1994) ("A party cannot wait until after receiving an unfavorable verdict, then raise an objection or state different grounds in the motions after verdict.").

¶17    Thus, to the extent P.L. is trying to challenge Dr. Taylor's oral testimony or the circuit court's reliance on that testimony in making the dangerousness determination, he has forfeited his right to do so. If P.L. had made a contemporaneous objection to Dr. Taylor's testimony he contends was hearsay, the County would have had the opportunity to either show that this evidence was not hearsay or that a hearsay exception applied. Moreover, if a hearsay objection was sustained, the County could have called to testify the "collateral sources" who witnessed P.L.'s dangerousness firsthand. By failing to object during Dr. Taylor's testimony, P.L. has forfeited his hearsay objections.

¶18    Second, the circuit court admitted Dr. Taylor's report over the objection P.L. did make, and although it may contain inadmissible hearsay, that does not negate the oral testimony of Dr. Taylor. The law permits physician expert witnesses to rely on hearsay in forming their opinions. ***Walworth County v. Therese B.***, 2003 WI App 223, ¶8, 267 Wis. 2d 310, 671 N.W.2d 377 ("It is

---

[5] "Although cases sometimes use the words 'forfeiture' and 'waiver' interchangeably, the two words embody very different legal concepts. 'Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right.'" ***State v. Ndina***, 2009 WI 21, ¶¶28-32, 315 Wis. 2d 653, 761 N.W.2d 612 (citation omitted).

well settled that it is proper for a physician to make a diagnosis in part upon medical evidence of which he has no personal knowledge but which he gleaned from the reports of others." (internal quotation marks omitted; quoted source omitted)).

¶19    The circuit court's determination that the County proved by clear and convincing evidence that P.L. was presently dangerous is supported by sufficient evidence in this Record.

B.  *Specific Findings Under **D.J.W.***

¶20    P.L.'s second contention is that the circuit court failed to make specific factual findings to support the dangerousness standard it relied on as required by **D.J.W.**  The Record belies this claim.

¶21    The circuit court specifically referenced WIS. STAT. § 51.20(1)(am) and § 51.20(1)(a)2.b., the second dangerousness standard.  It gave reasons why P.L. was dangerous under those standards, including pointing to Dr. Taylor's and Ms. Solberg's testimony.

¶22    "WIS[CONSIN] STAT. § 51.20(1)(am) provides a different avenue for proving dangerousness if the individual has been the subject of" a commitment immediately prior to the recommitment petition. ***Sheboygan County v. M.W.***, 2022 WI 40, ¶19, 402 Wis. 2d 1, 974 N.W.2d 733 (quoting ***Portage County v. J.W.K.***, 2019 WI 54, ¶19, 386 Wis. 2d 672, 927 N.W.2d 509).  Pursuant to § 51.20(1)(am), dangerousness "may be satisfied by a showing that there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn." ***M.W.***, 402 Wis. 2d 1, ¶20 (quoting § 51.20(1)(am)).  This method of

proving dangerousness is necessary because "an individual receiving treatment may not have exhibited any recent overt acts or omissions demonstrating dangerousness because the treatment ameliorated such behavior, but if treatment were withdrawn, there may be a substantial likelihood such behavior would recur." ***M.W.***, 402 Wis. 2d 1, ¶20 (quoting ***J.W.K.***, 386 Wis. 2d 672, ¶19). If a county relies on § 51.20(1)(am) to prove dangerousness, a link to one of the five dangerousness standards from § 51.20(1)(a)2 is required. ***D.J.W.***, 391 Wis. 2d 231, ¶59.

¶23 The circuit court's decision specifically explained

> that the extension for commitment is absolutely necessary under Standard 2. And with that, again, the recommitment standards -- I'll read again onto the record -- are that -- first of all, I do believe there's a substantial probability of physical harm to other subjects as manifested by the evidence of recent homicidal and/or violent behavior or evidence that others are placed with reasonable fear of violent behavior and serious physical harm as evidence of recent over acts, attempts, or threats to do serious physical harm. And, again, those threats were very real and they were noted and they were from [P.L.] to the HSD worker and were reiterated in the doctor's reports.

> Again, the second or additional standard for recommitment hearings is based on the review of the subject's treatment record. There's a substantial likelihood that the subject will become a proper subject for commitment under the standard if treatment were withdrawn. Now, I understand that because [P.L.]'s in custody in the Racine County jail, that this might not be the normal treatment protocol. However, he has refused to be compliant with his prescribed medication while on this commitment.

> He was given the settlement agreement, but failed. Then there was a commitment ordered. He was not medication compliant during that time. He was using illegal drugs. He was doing that unless he was in custody. Him being in custody is the only thing keeping him reverting back to illegal drugs, in my opinion.

11

He was offered services, but, again his in-custody status sometimes prevents even compliance with that. He is on again/off again but mostly off in his compliance. And that was the testimony of Ms. Stolberg; that he has disturbing thoughts, those of a pedophile, that he had disclosed to her. And Ms. Stolberg went on to say that he has no insight to his mental illness; that he is not able to comply with the conditions, including the medications orders; and he is not able to resist illegal drugs.

¶24 The circuit court further stated:

She [Dr. Taylor] put on the record that he has episodes of mania and depression, has psychosis. He is clearly psychotic -- and those are her words, and I wrote them down because I, again, was so shocked at these findings; that he hears voices telling him to rape and kill -- and I don't know if this is children or family members that are children, but young people.

There had been issues with aggression to his family, including siblings, which he verified in his own testimony, and that he hears voices that tell him he can control his family and/or control their thoughts[.]

¶25 This is sufficient under a recommitment. Proving dangerousness under (am) is different than proving it under an initial commitment because the subject has been under treatment that is supposed to be controlling dangerousness. Under (am), the County does not need to prove P.L. committed "a recent overt act, attempt or threat to act under par. (a)2.a. or b." WIS. STAT. § 51.20(1)(am). Rather, this dangerousness element is met when the County proves "there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn." *Id.*

¶26 That is what the County did here through Dr. Taylor's and Ms. Stolberg's testimony. P.L.'s testimony also supported the dangerousness element when he testified:

12

> I don't think about -- for the record, I don't think about rape and killing children. I don't think of the words "rape" and "kill" *very often anymore*. Now I'm stuck thinking other stupid shit.

(Emphasis added.)

¶27 The circuit court found that, based on P.L.'s treatment record, there is a substantial likelihood that he would be dangerous to others if treatment were withdrawn. That is all that is required, and this court concludes the evidence is sufficient to support the circuit court's determination. The commitment statutes were amended to add proof of dangerousness under WIS. STAT. § 51.20(1)(am) as a means of preventing the "revolving door" phenomenon, which resulted in a vicious cycle of treatment, release, overt act, and recommitment. *See Waupaca County v. K.E.K.*, 2021 WI 9, 395 Wis. 2d 460, 954 N.W.2d 366 (citation omitted). The legislature recognized that requiring an overt act by subjects before being able to treat the subject's mental illness would create more danger to both the subject and to others. *See id.*

¶28 This new standard has led to an explosion in litigation over the standard and attacks on circuit court recommitment orders and confusion about whether a County has met its burden of proving dangerousness in a recommitment. There is no confusion in this case on this Record. The County met its burden of proving P.L. is dangerous under WIS. STAT. § 51.20(1)(am) tied to § 51.20(1)(a)2, and the court did not err in making this determination based on the totality of the evidence presented.

> *By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.